AUTO ELECTRIC & SERVICE CORPORATION v ROCKWELL
INTERNATIONAL CORPORATION

Docket No. 49616. Submitted May 13, 1981, at Detroit.—Decided
November 16, 1981. Leave to appeal applied for.

Auto Electric & Service Corporation entered into a contract with
Rockwell International Corporation whereby Rockwell was to
supply engines and accessories for snowmobiles to Auto Elec-
tric, which is a central distributor of these items to dealers.
Rockwell assigned the contract to its West German subsidiary,
and it was shortly thereafter assigned again, to Scorpion, Inc.,
of Minnesota. Auto Electric thereafter experienced much diffi-
culty obtaining the parts necessary to continue its business.
Also, Scorpion imposed certain credit restrictions which had
not been previously required. Auto Electric brought an action
against Rockwell for breach of contract, alleging that the
assignments constituted a de facto termination of the contract
and seeking damages in the amount of inventory that plaintiff
held which Rockwell had refused to buy back pursuant to a
contract term providing for such a repurchase in the event
Rockwell should terminate the contract. The Wayne Circuit
Court, William J. Giovan, J., found that Rockwell's assignment
constituted either a de facto termination or a breach of con-
tract and awarded damages to the plaintiff. Defendant appeals.
*Held:*

1. The trial court did not clearly err in determining that the
assignment constituted a de facto termination. There was suffi-
cient evidence to support the finding that plaintiff's mainte-

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 839, 841.
[2] 6 Am Jur 2d, Assignments § 9.
[2, 7] 17 Am Jur 2d, Contracts § 404.
    Modern status of the rules regarding impossibility of performance
    as defense in action for breach of contract. 83 ALR2d 12.
[3] 22 Am Jur 2d, Damages § 25.
[4] 6 Am Jur 2d, Assignments § 9.
[5] 17 Am Jur 2d, Contracts § 244.
[6] 6 Am Jur 2d, Assignments § 21.

nance of its business was effectively prohibited by its inability to supply parts in a timely manner.

2. The amount of damages was governed by the contract. Based on the testimony presented, the trial court did not err in its determination of the amount of damages.

Affirmed.

D. C. RILEY, J., dissented. She would hold that, because the assignment of the contract was allowed by the contractual terms and therefore was assented to by the plaintiff, the plaintiff is precluded from subsequently objecting to the assignment based on a change in the plaintiff's chances of obtaining return performance. The doctrine of impossibility of performance is not applicable to this case. She would reverse.

### OPINION OF THE COURT

1. APPEAL — FINDINGS OF FACT — CLEAR ERROR — COURT RULES.

Findings of fact made by a trial court sitting without a jury are not to be set aside unless clearly erroneous; a finding is clearly erroneous when, although there is evidence to support it, a reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed (GCR 1963, 517.1).

2. CONTRACTS — DE FACTO TERMINATION OF CONTRACTS.

A trial court did not clearly err in finding that a defendant's assignment of a contract amounted to a de facto termination of the contract where sufficient evidence was presented to show that the assignment made performance under the agreement a practical impossibility.

3. DAMAGES — CALCULATION OF DAMAGES.

Damages need not be calculated with absolute exactness; it is sufficient if a reasonable basis of computation is employed even though the results are only approximate.

### DISSENT BY D. C. RILEY, J.

4. CONTRACTS — ASSIGNMENT.

*Generally, a contractual right may be assigned.*

5. CONTRACTS — JUDICIAL CONSTRUCTION.

*The primary rule of construing contracts is to ascertain the intent of the parties.*

6. CONTRACTS — ASSIGNMENT — OBJECTION TO ASSIGNMENT.

*An obligor's assent to assignment of a contract may preclude any*

*subsequent objection to the assignment based on a change in the obligor's duty, burden, risk or chance of obtaining return performance.*

7. Contracts — Impossibility of Performance.

*The doctrine of impossibility of performance is not a plaintiff's sword to be used in claiming that a defendant breached or terminated the contract but is a defendant's shield to be used as a defense to a charge that the contract has been breached or terminated.*

*Tobias & Sweeney,* for plaintiff.

*Buchanan, Ogne & Jinks, P.C.* (by *G. Cameron Buchanan* and *James W. Stuart),* for defendant.

Before: D. F. WALSH, P.J., and D. C. RILEY and R. D. KUHN,* JJ.

D. F. WALSH, P.J. Plaintiff brought a breach of contract action against defendant. Defendant appeals from the judgment entered in favor of plaintiff.

In 1969, plaintiff and defendant entered into a contract for the distribution of JLO engines, accessories and parts for snowmobiles. Plaintiff agreed to use its best efforts to promote, sell and service these products which were supplied by defendant through a warehouse located in Syracuse, New York.

By a letter dated March 26, 1974, defendant notified plaintiff that the contract had been assigned to Rockwell GmbH, a West German company. David W. Burke, Jr., former president of plaintiff corporation, expressed his dissatisfaction with the assignment because of anticipated difficulties in obtaining parts from a foreign supplier. Burke indicated in a letter of April 3, 1974, that plaintiff held $40,000 worth of JLO inventory.

_____
* Circuit judge, sitting on the Court of Appeals by assignment.

Burke requested that defendant accept this inventory for credit, but defendant never did so.

On October 14, 1974, plaintiff ordered some inventory from Rockwell GmbH but was informed that the contract had again been assigned, this time to Scorpion, Inc., of Crosby, Minnesota, and that all purchase orders should be directed to Scorpion. Plaintiff placed several purchase orders with Scorpion and some of them were filled. Burke testified that Scorpion, Inc., requested an irrevocable letter of credit, which had never been required in previous transactions.

In the complaint filed in August, 1975, plaintiff alleged that defendant's assignment constituted a de facto termination of the distributor agreement. Under the contract, a termination by defendant required that defendant buy back the current inventory. Plaintiff claimed that it held approximately $52,000 in parts and accessories, which defendant refused to buy back. Plaintiff sought $52,000 in damages.

After a three-day bench trial the court rendered a judgment in favor of plaintiff. The trial court found that the assignment to defendant's German subsidiary effectively ended plaintiff's ability to perform under the distributor agreement due to the difficulties in dealing with an overseas corporation and the credit restrictions imposed by the assignee. The court concluded that the assignment constituted either a de facto termination of the agreement or a breach of contract by defendant and awarded damages of $52,927.52.

Defendant claims on appeal that the trial court erred in finding that defendant had effectively terminated the contract between the parties. We disagree.

Under GCR 1963, 517.1, findings of fact shall not

be set aside unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Tuttle v Dep't of State Highways*, 397 Mich 44, 46; 243 NW2d 244 (1976).

In the instant case the contract between the parties specifically stated that it "shall be personal to the Distributor [plaintiff] and nonassignable by it but may be assigned by Rockwell". The agreement also contained the following clause with respect to the termination of the contract:

"7. This Agreement is subject to termination by either party on ninety (90) days written notice. Upon termination, the Distributor shall return to Rockwell all materials supplied by Rockwell which may be in the Distributor's custody other than Products sold hereunder.

"Upon termination of this Agreement by the Distributor, Rockwell shall have the right, but shall not be obligated, to purchase at invoice or then current list prices, whichever is lower, less then current discounts, any or all engines and parts which the Distributor has on hand at the termination date, less a ten percent (10%) charge for restocking, reconditioning, or repair.

"Upon termination of this Agreement by Rockwell, Rockwell shall purchase at invoice price less then current discounts, any or all engines and parts which the Distributor has on hand at the termination date, less any allowances for damaged goods."

In the present case there was no claim that there was an express termination of the contract by Rockwell in accordance with clause 7. However, upon reviewing the entire record we find sufficient support for the trial court's finding that defendant's conduct amounted to a de facto termination

of the contract since the assignment made performance under the agreement a practical impossibility.

The testimony established that the major share of plaintiff's business was dependent upon the sale of replacement parts for JLO engines. Plaintiff, a central distributor, sold these parts to snowmobile dealers, who in turn provided them to the actual customers. Because of the relatively short season involved in this business, it was imperative that the engine parts be readily available once they were ordered from the manufacturer. When Rockwell International was handling plaintiff's purchases from the warehouse in Syracuse, New York, emergency orders had been filled within one day to one week and general stock orders were generally shipped within three to four weeks.

After the assignments of the contract were made, however, the operation of the business was altered substantially. In a deposition, James Engen, Scorpion's vice president of operations, admitted that the company had an inadequate inventory for the older engine parts. Engen stated that some items were available only from Germany.[1] Engen acknowledged that Scorpion had received complaints regarding the unavailability of parts and service. He also admitted that there was some merchandise that was ordered but never shipped to plaintiff. One such purchase order was introduced into evidence. Upon further questioning, Engen stated that the length of time of shipment from Germany was totally dependent on the specific part involved, but that a six- to eight-month

---

[1] Together with the contract assignments, Scorpion had purchased the complete manufacturing business from Rockwell GmbH. The actual delivery of the assets and equipment was staggered over a three-year period. Therefore, certain engine parts still had to be obtained from the foreign company.

delay was possible. The one purchase order (which was never filled) sent by plaintiff to Rockwell GmbH on October 14, 1974, was not even received by the German company until November 22, 1974. The back-ordered parts of a December 16, 1974, purchase order by another midwestern distributing company were not delivered until March 10, 1975.

David W. Burke, Jr., also testified that Scorpion's service was inadequate because of the insufficient inventory of parts. After the assignment to Scorpion, plaintiff only purchased $2,800 worth of engine parts, as compared with orders from Rockwell International amounting to $60,000 made in one of the previous years. Burke concluded that the huge decline in business was attributable to poor market conditions and the unavailability of the parts.

We are persuaded on this record that there is sufficient support for the trial court's finding that defendant had de facto terminated the contract. It was impossible for plaintiff to operate successfully unless it could give prompt service to its customers. Defendant's assignment of the contract curtailed timely shipment of parts and effectively prohibited plaintiff from maintaining its business. We conclude that the findings of the trial court are not clearly erroneous.

Defendant also argues that the trial court erred in assessing damages in the amount of $52,927.52. We find no error.

A trial court need not compute damages with mathematical exactness. *Helzer v Local 98, Plumber's Union*, 97 Mich App 376, 377; 296 NW2d 28 (1980). In *Waskin Development Co v Weyn*, 369 Mich 121, 128; 119 NW2d 662 (1963), the Court stated:

"Damages need not be calculated with absolute exactness. It is sufficient if a reasonable basis of computation be employed although the results be only approximate."

In the instant case, the amount of damages is governed by the contract which calls for an amount equivalent to "invoice price * * * [of] any or all engines and parts which the Distributor has on hand at the termination date * * *". The date of the de facto termination was March, 1974. Since plaintiff was unable to produce the December, 1973, inventory printout, the trial court used the November, 1974, inventory list. Testimony indicated that there had been only "very minor" purchases between March, 1974, and November, 1974. The inventory price required adjustment, however, because the printout reflected the new invoice prices which defendant or its assignees were charging for the same parts, rather than the actual prices plaintiff had paid for the goods. David W. Burke, Jr., testified that the 1974 prices were approximately 10%, and no more than 15%, higher than the 1969 prices. Based on this testimony, the court reduced the November, 1974, figures by 10% and arrived at the invoice price of $52,927.52. Since the amount of damages has a reasonably certain basis, as reflected by testimony in the record, we conclude that the trial court did not err in computing this figure.

Finally, we reject two additional arguments raised by defendant concerning damages. The trial court was not required to use the $40,000 figure contained in plaintiff's letter to defendant since Burke testified that the amount was an estimate and had not been verified prior to its inclusion in the letter. Secondly, the total inventory price was not subject to a 40% reduction because there was that amount of "dead stuff". Burke used this term

to identify what he considered to be the "slow moving" part of the inventory.[2] The agreement between the parties does not provide for a reduction of the inventory price by the amount of slow moving inventory or "dead stuff" held by plaintiff.

The decision of the trial court is affirmed. Costs to plaintiff.

R. D. KUHN, J., concurred.

D. C. RILEY, J. *(dissenting).* It is an accepted maxim that *pacta sunt servanda,* contracts are to be kept. The majority has determined that this particular contract has not been kept. They hold that there is sufficient evidence to support the trial court's finding that defendant's conduct amounted to a de facto termination of the contract because the assignment made performance under the agreement a practical impossibility. The majority does not cite any authority which supports its position that a de facto termination occurs when an assignment allegedly makes performance a practical impossibility and when, as here, the contract provided the defendant with a right to assign its interest. I respectfully dissent.

The Restatement Contracts, 2d, § 317(2), states:

"A contractual right can be assigned unless
"(a) the substitution of a right of the assignee for the

---

[2] "*Q.* And did you ask the company to take back part of that inventory?

* * *

"*A.* Yes, sir.
"*Q.* All right. Now, what did you ask them to take back?
"*A.* We asked them to take back the part of our inventory which we determined to be slow moving.
"*Q.* Was it obsolete?
"*A.* No, I don't think so.
"*Q.* It was just slow moving."

right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

\*   \*   \*

"(c) assignment is validly precluded by contract."

The general presumption then is that a contractual right may be assigned.

Plaintiff, Auto Electric, the obligor, is arguing that the assignment materially impaired its chance of obtaining return performance. Plaintiff contends the assignment, being improper, was a breach of contract or caused termination of the agreement, thereby invoking the contract provision requiring defendant to purchase plaintiff's inventory.

I do not agree. Both parties were established in business when they entered into the contract. Presumably, the plaintiff could have chosen to sell any one of a number of snowmobile lines available in the country. The record is void of any indication that the parties dealt at anything less than arms length while negotiating this contract.

"In construing contracts, the primary rule of construction is to ascertain the intent of the parties." *Amoco Oil Co v Kraft,* 89 Mich App 270, 273; 280 NW2d 505 (1979). The intent of the parties in this case is realized by a plain-meaning interpretation of the contract provision that the contract "shall be personal to the Distributor [plaintiff] and nonassignable by it but *may be assigned* by Rockwell [defendant]". (Emphasis added.) Plaintiff then had knowledge that defendant may assign its interest.

The Restatement Contracts, 2d, § 323, states:

"Obligor's Assent to Assignment or Delegation

"(1) *A term of a contract manifesting an obligor's assent* to the future assignment of a right or an obligee's assent to the future delegation of the performance of a duty or condition *is effective despite any subsequent objection.*" (Emphasis added.)

Plaintiff is now objecting to a situation which, by earlier approval, it sanctioned. The comment to § 323 is insightful in this case:

"a. *Effect of assent.* The assent of the obligor is not ordinarily necessary to make an assignment effective. *But his assent may operate to preclude objection based on a change in his duty, burden or risk or in his chance of obtaining return performance.* See § 317." (Emphasis added.)

I conclude that when two business parties, at arms length, enter into a contract, they are bound by the intent manifested in the plain meaning of their terms. The assignment by defendant was agreed to by plaintiff and that assent precludes a subsequent objection based on a change in plaintiff's chance of obtaining return performance.

The majority overlooks this legal position and decides this case on its facts, finding a de facto termination because performance of the contract was a practical impossibility. Defendant, and subsequently its legal assigns, stood ready and able to perform under the contract. Defendant assigned the contract to a German subsidiary around March of 1974, and it was later assigned to a Minnesota corporation, around October of 1974. The assignments, especially to the German subsidiary, inconvenienced plaintiff. However, in light of its agreement by the contract to such an assignment, no termination by practical impossibility can be found.

The trial court stated it was not necessary to decide if there was a breach of contract or a de facto termination. The majority finds sufficient evidence to support the latter finding since assignment made performance a practical impossibility. Their language conjures up the respectable doctrine of impossibility of performance. This doctrine, however, is not a plaintiff's sword claiming defendant breached or terminated the contract but a defendant's shield to a charge that the contract has been breached or terminated. 17 Am Jur 2d, Contracts, § 404.

I am left with a firm and definite conviction that a mistake has been committed. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976). Therefore, I conclude that the trial court erred in its findings of fact which are clearly erroneous. I would reverse.